In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 02-2409 & 02-3021

DEMETRIUS MCCANN,

*Plaintiff-Appellee/*
*Cross-Appellant,*

v.

SAM A. MANGIALARDI,

*Defendant-Appellant/*
*Cross-Appellee.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 94 C 5156—**Harry D. Leinenweber**, *Judge.*

ARGUED FEBRUARY 10, 2003—DECIDED JULY 22, 2003

Before POSNER, MANION, and KANNE, *Circuit Judges.*

MANION, *Circuit Judge.* Otis Moore operated a cocaine trafficking business in Chicago Heights, Illinois. One of his top assistants was Demetrius McCann. Also on the payroll was Sam Mangialardi, the deputy chief of the Chicago Heights police department, who not only protected Moore's operation but also investigated and arrested many of Moore's competitors. At some point, Mangialardi and Moore suspected McCann of being a federal informant, and they agreed that Moore should get rid of him. Moore set McCann up for arrest by having cocaine planted in a

car McCann was driving, then notified Mangialardi of McCann's location. Mangialardi ordered police to stop, search and arrest McCann. After his arrest McCann pleaded guilty, was sentenced, and served time in prison. After his release on parole, McCann discovered that Mangialardi had been prosecuted and that Moore, testifying for the government, disclosed he had planted cocaine in the car McCann was driving when arrested. McCann filed suit against the City of Chicago Heights, its police department, and a number of government officials, including Mangialardi. Ultimately, the litigation boiled down to McCann's claims against Mangialardi for false arrest under the Fourth Amendment and a Fourteenth Amendment violation of his due process rights. Mangialardi moved to dismiss McCann's Fourth Amendment claim on the pleadings, which the district court granted. Mangialardi then moved for summary judgment of McCann's due process claim on the ground that he was entitled to qualified immunity. The district court denied the motion, and Mangialardi appeals. McCann cross-appeals the district court's dismissal of his Fourth Amendment false arrest claim. We reverse in part and affirm in part.

## I.

From 1988 until 1990, Demetrius ("Trent") McCann was a "lieutenant" in a narcotics trafficking organization operated by Otis Moore, holding the position of "overseer." During this time period, McCann sold cocaine for Moore's organization. As part of the operation, Moore paid protection money to Sam Mangialardi, who at that time was the deputy chief of the Chicago Heights police department. Mangialardi's "duties" were to protect Moore's operation from police interference and to arrest any drug competitors whom Moore wanted out of the way. At some point

in 1990, Mangialardi told Moore that he suspected McCann might be working for the Federal Bureau of Investigation ("FBI") as an informant, and advised him to "get rid of that guy." In November of that same year, Ray Cooper, one of Moore's subordinates, found an FBI or IRS business card while searching through some of McCann's personal belongings. Cooper relayed this information to Moore, who in turn advised Mangialardi of the discovery.

Shortly thereafter, Moore and Mangialardi met to discuss how to best deal with McCann. During the meeting, Moore told Mangialardi that McCann "would have drugs in his car shortly," to which Mangialardi responded, "I will be at the station. Just give me a call." On November 20, 1990, Moore instructed another subordinate, Johnson Lee, to "bring his black Cutlass" so that he could plant "100 dime bags of cocaine . . . under the springs of the driver's side seat." After Moore planted the drugs, the black Cutlass was parked near McCann's residence. Moore then ordered Lee to direct Terrell Jones, yet another subordinate, to ask McCann to follow him in the black Cutlass under the pretense that Jones's car was about to run out of gas. Jones made the request, and McCann agreed to follow him in the Cutlass (unaware that Moore had planted the drugs). Upon seeing the two cars depart from McCann's house, Moore—who was carefully watching events transpire from a safe distance with binoculars—immediately called Mangialardi at the police station to tell him that "it was going down, that they were moving westbound on 14th street." Moore then followed Jones and McCann in his car, and, shortly thereafter, called Mangialardi back to advise him of "the location where they was [sic] and the direction they was [sic] moving in." Mangialardi advised police officers of the "tip," and in short order the police surrounded the car McCann was driving. When the police were unable to find any drugs, Moore called the police

station again, this time speaking with Officer Tony Murphy. Moore advised Murphy that the drugs were "up under the driver's side seat," and Murphy relayed this information to the officers on the scene, who promptly found the planted drugs and arrested McCann.

On December 21, 1990, McCann was indicted for possession of a controlled substance and for possession of a controlled substance with the intent to distribute. Faced with the prospect of a 30-year prison sentence, McCann pleaded guilty on January 31, 1991, receiving a five-year term of imprisonment. In December 1991, Moore was arrested by federal law enforcement officers, and thereafter indicted for tax evasion, participating in a criminal enterprise, money laundering, and conspiracy. In return for a lighter sentence, Moore agreed to testify as part of the government's prosecution of Mangialardi, who had also been indicted for similar criminal acts. During Moore's testimony, which he gave on March 24, 1994, he admitted to orchestrating the arrest of McCann on November 20, 1990, and claimed that sometime after the arrest he informed Mangialardi that McCann was not on a routine drug delivery at the time of his arrest, but instead Moore's people had planted drugs in the car McCann was driving.[1]

During Mangialardi's trial, McCann was apparently on parole and soon learned of Moore's admission to planting drugs in the car McCann was driving on the day of his arrest. On August 24, 1994, McCann filed a complaint against the City of Chicago Heights and numerous government officials and police officers (including Mangialardi), alleging, *inter alia*, that they violated his rights under the

---

[1] Mangialardi was subsequently convicted of racketeering, "conspiracy against rights," tax evasion, and intimidation of a witness.

Fourth and Fourteenth Amendments to the United States Constitution. A great deal of procedural wrangling then ensued, but eventually the litigation was narrowed to two parties, McCann and Mangialardi, and two claims, a Fourth Amendment false arrest claim and a Fourteenth Amendment due process claim.[2] On February 16, 2001, the district court dismissed McCann's Fourth Amendment false arrest claim on the pleadings, holding that the claim was time-barred. On November 2, 2001, Mangialardi filed a motion for summary judgment on McCann's due process claim, asserting that he had not violated McCann's constitutional right to due process and that he was entitled to qualified immunity from the claim. The district court denied this motion on April 24, 2002, which Mangialardi appeals. McCann cross-appeals the district court's dismissal of his Fourth Amendment false arrest claim.

## II.

The first question before us on appeal is whether the district court erred in concluding that Mangialardi was not entitled to qualified immunity from McCann's due process claim. Mangialardi is authorized to bring this interlocutory appeal because he is raising the question as to whether, based on the facts taken in the light most favorable to McCann, he should have prevailed on his defense of qualified immunity. *Mitchell v. Forsyth*, 472 U.S. 511, 526-27 (1985); *Cavalieri v. Shepard*, 321 F.3d 616, 618 (7th

---

[2] On April 30, 2002, pursuant to an agreement between McCann and the City of Chicago Heights to indemnify Mangialardi, McCann agreed to dismiss the City and all named defendants other than Mangialardi from the lawsuit.

Cir. 2003). We must resolve a qualified immunity issue as early as possible in the proceedings because it is an "*'immunity from suit* rather than a mere defense to liability.'" *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (emphasis in original) (citation omitted). In evaluating whether a claim for qualified immunity is well founded, a court must undertake a two-step inquiry. *Saucier*, 533 U.S. at 201. First, we must consider whether the facts alleged by the plaintiff demonstrate that the officer's conduct violated a constitutional right. *Id.* If the plaintiff cannot make such a showing, our inquiry is finished and summary judgment must be entered in favor of the government official. *Id.* If, on the other hand, the facts alleged by the plaintiff, viewed in their most favorable light, show the violation of a constitutional right, the next step is to determine whether that right was clearly established at the time the violation occurred. *Id.*

## A.  Procedural Due Process Claims

McCann argues that Mangialardi violated his right to procedural due process under the Fourteenth Amendment by: (1) "purposefully creating false evidence for the purpose of procuring [his] criminal conviction and imprisonment"; (2) depriving him of the right to a fair trial "even though he plead guilty and no trial occurred"; and (3) failing to disclose exculpatory evidence of his innocence to prosecutors, defense counsel, and the court before the entry of his guilty plea.

McCann cites no authority to support his assertion that his right to procedural due process was violated by Mangialardi allegedly manufacturing evidence for the purpose of having him prosecuted, convicted and imprisoned, and, therefore, the claim is waived. *Gable v. City of*

*Chicago*, 296 F.3d 531, 538 (7th Cir. 2002) (holding that arguments not developed on appeal are waived). Even in the absence of such a waiver, however, McCann's first "due process" claim still fails because it is nothing more than a recast of his Fourth Amendment false arrest claim—which we address in Section II (B)—in the guise of a substantive (rather than procedural) due process violation. The Supreme Court has made it clear that a substantive due process claim may not be maintained when a specific constitutional provision (here the Fourth Amendment) protects the right allegedly violated. *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997); *Graham v. Conner*, 490 U.S. 386, 394 (1989). Moreover, to the extent McCann maintains that Mangialardi denied him due process by causing him to suffer "[a] deprivation of liberty from a prosecution and a contrived conviction . . . deliberately obtained from the use of false evidence," his claim is, in essence, one for malicious prosecution, rather than a due process violation. As we emphasized in *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001), "the existence of a tort claim under state law knocks out any constitutional theory of malicious prosecution," *id.* at 750, and Illinois has a common law tort action for malicious prosecution. *Miller v. Rosenberg*, 749 N.E.2d 946, 951-52 (Ill. 2001). Thus, any claim McCann had against Mangialardi for malicious prosecution should have been brought under Illinois law. *Newsome*, 256 F.3d at 750. In sum, McCann cannot do an end run around the foregoing precedent by combining what are essentially claims for false arrest under the Fourth Amendment and state law malicious prosecution into a sort of hybrid substantive due process claim under the Fourteenth Amendment.

McCann's second due process claim is that, notwithstanding his guilty plea, Mangialardi deprived him of the right to a fair trial. Aside from the fact that he did not

have a trial, McCann waived this argument by failing to
first present it to the district court for its consideration.
*United States v. Shorty*, 159 F.3d 312, 313 (7th Cir. 1998)
(holding that the " 'failure to raise an issue before the dis-
trict court results in a waiver of that issue on appeal' ")
(citation omitted).

Although waived, McCann's assertion that he was de-
nied a fair trial is essentially subsumed into his third and
final due process claim. McCann alleges that Mangialardi
violated his right to procedural due process by failing
to disclose to prosecutors, defense counsel, and the court,
prior to the entry of his guilty plea, that the drugs found
in the car he was driving on the day of his arrest were
planted without his knowledge. In *Brady v. Maryland*, 373
U.S. 83 (1963), the Supreme Court held that during trial
the government is constitutionally obligated to disclose
evidence favorable to the defense when the evidence is
material to either the guilt or punishment of the defendant.
*Id.* at 87. The Court has yet to address, however, whether
the Due Process Clause requires such disclosures outside
the context of a trial. *See United States v. Tadros*, 310 F.3d
999, 1005 (7th Cir. 2002) (holding that "[a] violation of
the *Brady* rule occurs only when the government with-
holds evidence which, had it been disclosed, creates a
reasonable probability that the result of the trial would
have been different"); *United States v. Nash*, 29 F.3d 1195,
1202-03 n.5 (7th Cir. 1994) (refraining from addressing the
issue of whether "*Brady* may be invoked to challenge
the voluntariness of the plea where a defendant's (other-
wise voluntary plea) was given without knowledge of . . .
undisclosed exculpatory evidence").

A recent decision by the Supreme Court, however,
indicates that such a claim might be viable in certain cases.
In *United States v. Ruiz*, 536 U.S. 622 (2002), the Court
addressed an issue similar to the one before us: "whether

the Constitution requires . . . *preguilty plea disclosure* of impeachment information." *Id.* at 629. (emphasis added). *Ruiz* held that such disclosures were not mandated by the Due Process Clause, but in doing so noted that "impeachment information is special in relation to the *fairness of the trial*, not in respect to whether a plea is *voluntary* ('knowing,' 'intelligent,' and 'sufficient[ly] aware')." *Id.* (emphasis in original). In contrast, the exculpatory evidence at issue in this case—i.e., Mangialardi's alleged knowledge of McCann's factual innocence—is entirely different. Thus, we have a question not directly addressed by *Ruiz*: whether a criminal defendant's guilty plea can ever be "voluntary" when the government possesses evidence that would exonerate the defendant of any criminal wrongdoing but fails to disclose such evidence during plea negotiations or before the entry of the plea.

The Supreme Court's decision in *Ruiz* strongly suggests that a *Brady*-type disclosure might be required under the circumstances of this particular case. In holding that the Due Process Clause does not require the government to disclose impeachment information prior to the entry of a criminal defendant's guilty plea, the Court in *Ruiz* reasoned that it was "particularly difficult to characterize impeachment information *as critical information of which the defendant must always be aware prior to pleading guilty . . . .*" 536 U.S. at 630 (emphasis added). The Court also noted that "the proposed plea agreement at issue . . . specifies the Government will provide 'any information establishing the factual innocence of the defendant,'" *id.* at 631, and "[t]hat fact, along with other guilty-plea safeguards . . . diminishes the force of [defendant's] concern that, in the absence of the impeachment information, innocent individuals accused of crimes will plead guilty." *Id.* Thus, *Ruiz* indicates a significant distinction between impeachment information and exculpatory

evidence of actual innocence. Given this distinction, it is highly likely that the Supreme Court would find a violation of the Due Process Clause if prosecutors or other relevant government actors have knowledge of a criminal defendant's factual innocence but fail to disclose such information to a defendant before he enters into a guilty plea.

We need not resolve this question, however, because even if such disclosures of factual innocence are constitutionally required, McCann has not presented any evidence that Mangialardi knew about the drugs being planted in McCann's car prior to the entry of his guilty plea.

To begin with, during the proceedings in the district court, McCann failed to answer the following request for admission submitted by Mangialardi: "In regard to the November 20, 1990 arrest, Plaintiff has no evidence from any source that Sam Mangialardi or any other Chicago Heights police officer withheld any exculpatory evidence from Plaintiff, the state's attorneys, or Plaintiff's attorney prior to the date when Plaintiff pled guilty on January 31, 1991." This default admission is, in and of itself, fatal to McCann's final due process claim. Fed. R. Civ. P. 36(a) (a party who fails to respond to requests for admission within 30 days is deemed to have admitted those requests); *Walsh v. McCain Foods Ltd.*, 81 F.3d 722, 726 (7th Cir. 1996) (same). We also note that McCann made no attempt to withdraw the admission by petitioning the court for such withdrawal under Fed. R. Civ. P. 36(b),[3] and,

---

[3] Federal Rule of Civil Procedure 36(b) provides that:

> Any matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission. Subject to the provision of Rule 16 governing amendment of a pretrial order, the court
> (continued...)

therefore, it is "conclusively established" for purposes of this litigation that he has no evidence that Mangialardi withheld exculpatory evidence from him prior to the entry of his guilty plea. *United States v. Kasuboski*, 834 F.2d 1345, 1350 (7th Cir. 1987) (holding that "[a]dmissions made under Rule 36, even default admissions, can serve as the factual predicate for summary judgment"). The district court erred by not analyzing this admission and giving it preclusive effect.

Furthermore, even without the default admission, the record in this case does not support McCann's assertion that at the time he entered his guilty plea Mangialardi was aware that the drugs McCann was charged with possessing on the day of his arrest had been planted in the car without his knowledge. McCann's entire argument is premised on the testimony of Otis Moore at Mangialardi's criminal trial on March 24, 1994. According to McCann, this testimony supports his contention that Mangialardi knew that he was innocent of the charges brought against him by the government because: (1) Mangialardi conspired with Moore to "cause drugs to be planted" in the car he was driving and to have him falsely arrested; or (2) at the very least, Mangialardi learned that Moore planted the drugs in his car sometime after his arrest of November 20, 1990, but before he entered a guilty

---

[3]  (...continued)
   may permit withdrawal or amendment when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits. Any admission made by a party under this rule is for the purpose of the pending action only and is not an admission for any other purpose nor may it be used against the party in any other proceeding.

plea on January 31, 1991. The record supports neither of McCann's assertions.

First, Moore's testimony at Mangialardi's criminal trial conclusively demonstrates that Moore did not tell Mangialardi about planting drugs in McCann's car until after McCann had been arrested. Recall that McCann was a key player in Moore's drug operation, so drug deliveries were part of his routine. When Mangialardi suspected McCann was an FBI informant, he told Moore to get rid of him. At Mangialardi's criminal trial, Moore testified only that he told Mangialardi, prior to the arrest, that McCann "would be having drugs in his car shortly," to which Mangialardi replied, "I will be at the station. Just give me a call." Thus, although Moore's testimony shows that he and Mangialardi concocted a scheme to have McCann arrested, it does not demonstrate that Mangialardi conspired with Moore to have McCann *falsely* arrested. Indeed, with respect to the discussion Moore and Mangialardi had shortly after McCann's arrest, Moore testified that he could not recall when he informed Mangialardi of "how the drugs had gotten into the car," but "it was after the conversation" that took place "shortly after the incident." The plot was to catch McCann "dirty" with illegal drugs, but nothing in the record suggests that Mangialardi expected McCann to be caught during anything other than a routine drug delivery. In short, Mangialardi did not need to know how the drugs got there, and Moore's undisputed testimony shows that he did not know about the plant until sometime after the arrest.[4]

---

[4] The text of Moore's relevant testimony regarding when Mangialardi became aware of the plant is attached as an appendix to this opinion.

Second, Moore's testimony does not support McCann's contention that Mangialardi knew that Moore planted the drugs on McCann prior to the time he pleaded guilty on January 31, 1991. At Mangialardi's trial, Moore was asked by the government whether he recalled "at any time having a conversation with [Mangialardi] in which you informed him of how the drugs got into the car?" Although Moore answered this question in the affirmative, he could not recall when that conversation "took place." In the absence of evidence demonstrating that Mangialardi knew on or before January 31, 1991, that Moore planted drugs in the car McCann was driving, there is no factual basis upon which McCann can construct the novel due process claim he advocates on appeal. *Borcky v. Maytag Corp.*, 248 F.3d 691, 695 (7th Cir. 2001) (holding that mere speculation is insufficient to withstand a motion for summary judgment).

McCann attempts to make up for this lack of evidentiary support by asserting that Moore's act (and thus knowledge) of planting drugs on him is imputed to Mangialardi because they were co-conspirators. In support of this argument, McCann relies heavily on our decision in *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988), where we held that a government official is liable as a conspirator, for purposes of establishing liability under § 1983, if he is "a voluntary participant in a common venture, although [he] need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are . . . [so long as he] understand[s] the *general objectives of the scheme, accept[s] them, and agree[s], either explicitly or implicitly, to do [his] part to further them." Id.* at 992 (emphasis added). Section 1983 claims, however, must be premised on the violation of a constitutional right. *Henderson v. Bolanda*, 253 F.3d 928, 932 n.3 (7th Cir. 2001). Here, as previously noted, Moore testified that Mangialardi did

not know before the arrest that the drugs were planted, so they obviously did not conspire to have McCann falsely arrested. The record shows only that Moore and Mangialardi schemed to have McCann, a drug dealer, arrested the next time he was traveling in a car with drugs, something he routinely did. Although this might con-stitute a criminal conspiracy to obstruct justice (i.e., inter-ference with a federal drug investigation), there is simply no evidence that the general objective of Moore and Mangialardi's "conspiracy" was to have McCann falsely arrested,[5] which is the linchpin of McCann's third and final due process claim. For all of the foregoing reasons, McCann cannot demonstrate that Mangialardi violated his right to due process.

## B. Fourth Amendment False Arrest Claim

Finally, we address McCann's cross appeal of the dis-trict court's dismissal of his Fourth Amendment (false arrest) claim on the ground that the claim was time-barred, which we review *de novo. Hernandez v. City of Goshen, Indiana*, 324 F.3d 535, 537 (7th Cir. 2003). In conducting this review, we are required to accept all of the well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of McCann. *Id.*

---

[5] McCann also argues that Mangialardi violated his right to procedural due process by failing to disclose his knowledge of the planted drugs prior to sentencing. This argument, however, fails for the same reason as McCann's primary *Brady* argument; because there is no evidence that Mangialardi knew about the drug plant at the time of sentencing (which took place on January 31, 1999, the same day as the entry of the guilty plea). Moreover, McCann did not make this argument to the district court, and therefore may not raise it on appeal. *Shorty*, 159 F.3d at 313.

On appeal, McCann argues that the district court erred in precluding him from asserting the equitable tolling doctrine with respect to his Fourth Amendment false arrest claim, and in dismissing the claim as time-barred. We need not address the merits of McCann's argument, however, because even if the district court did err in this regard, the nature of the record makes it unnecessary to remand the claim for further consideration. In reaching this conclusion, we recognize that a 12(b)(6) dismissal is only appropriate when a court, after examining the complaint, concludes that the plaintiff can prove no set of facts that would entitle him to relief. *Hernandez*, 324 F.3d at 537. But here, we are not just dealing with a stand-alone claim dismissed under 12(b)(6); we also have before us McCann's due process claim, which: (1) has a fully developed record; (2) was briefed on the merits both below and on appeal; and (3) is premised upon the same factual allegations as his Fourth Amendment false arrest claim. It would, therefore, make little sense, or promote the interests of judicial economy, to remand the false arrest claim back to the district court for the purpose of allowing McCann to conduct a second round of discovery. McCann has already been given the opportunity to establish a record to support his allegation that Mangialardi conspired with Moore to have him falsely arrested by planting drugs in his car without his knowledge, but he failed to do so.[6] He is not

---

[6] We reach this conclusion even though McCann filed a motion for an extension of time to conduct discovery before the notice of appeal in this case was docketed. The appropriate time for McCann to have sought such an extension was *before* he decided to oppose Mangialardi's motion for summary judgment. Federal Rule of Civil Procedure 56(f) "authorizes a district court to refuse to grant a motion for summary judgment or to

(continued...)

entitled to another bite at the apple. Nor is there any reason to send the claim back to the district court for further consideration on the merits, based on the record before us, when it is abundantly clear that McCann cannot prevail. As previously noted, McCann's assertion that Mangialardi conspired with Moore to plant drugs in his car, or otherwise sought to have him *falsely* arrested, is not supported by any evidence whatsoever. *Miller Aviation v. Milwaukee County Bd. of Supervisors,* 273 F.3d 722, 731 (7th Cir. 2001) (holding that "[w]hen a 'claim plainly lacks merit, it is better [for the Court of Appeals] to resolve it on the merits rather than remand for a determination by the district judge' . . . ."); *Otto v. Variable Annuity Life Ins. Co.,* 814 F.2d 1127, 1138 (7th Cir. 1986) (holding that interests of judicial economy weigh against sending a case back to the district court when "there is nothing to be gained from a remand"). Because Mangialardi would be entitled to judgment as a matter of law on remand, we see no reason to disturb the district court's dismissal of the claim.

---

[6] (...continued)
continue its ruling on such a motion pending further discovery *if the nonmovant submits an affidavit demonstrating why it cannot yet present facts sufficient to justify its opposition to the motion."* *Woods v. City of Chicago,* 234 F.3d 979, 990 (7th Cir. 2000) (emphasis added). McCann, however, failed to make such a request. Instead, he chose to oppose Mangialardi's motion for summary judgment based on the existing record. Thus, the fact that he subsequently requested a discovery continuance is of no consequence. *Id.* (rejecting party opponent's argument that district court's entry of summary judgment was erroneous because he had not been given "a fair opportunity to conduct such discovery" on the basis that the party opponent's failure to file a Rule 56(f) motion was sufficient, in and of itself, to affirm the district court's decision); *see also Wallace v. Tilley,* 41 F.3d 296, 303 (7th Cir. 1994).

### III.

For the reasons outlined in this opinion, we REVERSE the district court's decision denying Mangialardi summary judgment on McCann's due process claim(s) and REMAND the case to the district court with instructions to enter judgment in favor of Mangialardi, and AFFIRM the court's dismissal of McCann's Fourth Amendment false arrest claim.

## APPENDIX

At Sam Mangialardi's criminal trial, the following exchange took place between the federal prosecutor and Otis Moore:

Q.  What did you say to Sam Mangialardi at that time?

A.  I told him that Ray had did a search of Trent McCann and he found the card, either the IRS or the FBI card, on him.

. . .

Q.  What did you say to him and what did he say to you?

A.  I told him that Trent would be having drugs in his car shortly. And he said, "I will be at the station. Just give me a call."

. . .

Q.  After [McCann's arrest] did you have—ever have a conversation with [Mangialardi] about what happened?

A.  Yes, I did . . . .

Q.  Do you recall, was it that day or was it the next day?

A.  It wasn't that day.

A.  Do you recall how many days after it was?

A.  It was shortly after the incident.

Q.  Where did the conversation take place?

A.  I don't recall the exact place.

Q.  Was it in person or over the phone?

A.  I don't recall.

Q.  What did you say to him at that time, to Sam Mangialardi about Trent McCann?

A.  He said, "Yeah, that guy finally got caught dirty, huh?" And I said, "Yeah." I said—I just—we just sort of laughed at it. It was funny between the both of us. It was sort of like just funny.

Q.  During that conversation did you tell him how the drugs had gotten into the car?

A.  I don't recall.

Q.  Do you recall at any time having a conversation with [Mangialardi] in which you informed him of how the drugs got in the car?

A.  Yes, I do.

Q.  Do you recall when that took place.

A.  No, I don't.

Q.  Was it before or after the conversation you just referred to?

A.  It was after the conversation.

Q.  Do you recall who was present?

A.  Me and Sam Mangialardi.

Q.  What did you tell him at that time?

A.  I just told him it was pretty smooth how I did that.

Q.  Did you—what did you tell him then?

A.  I told him that, you know, I just—I put it up under there [i.e., the driver's side seat] and I just basically said that Trent didn't know nothing. He was just—didn't even know.

Q.  What did he do—what did Sam Mangialardi say
or do at that time?

A.  Nothing.


A true Copy:

Teste:


_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*