In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 13-3343, 13-3346 & 13-3347

ROBERT LEE STINSON,

*Plaintiff-Appellee,*

*v.*

JAMES GAUGER, LOWELL T. JOHNSON,
and RAYMOND RAWSON,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 09-C-1033 — **C.N. Clevert, Jr.**, *Judge.*

ARGUED JUNE 6, 2014 — DECIDED AUGUST 25, 2015

Before BAUER, MANION, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Robert Lee Stinson spent 23 years in prison for a murder he did not commit. He was exonerated by DNA evidence and now sues the lead detective and two forensic odontologists who investigated the murder and later testified at trial. The odontologists were the key witnesses for

the prosecution. They testified that bite marks on the victim's body matched Stinson's dentition. In this suit for damages, *see* 42 U.S.C. § 1983, Stinson alleges that the odontologists fabricated their opinions, the detective put them up to it, and all three defendants suppressed evidence of the fabrication, all in violation of his right to due process of law.

The case comes to us on appeal from the district court's denial of the defendants' claim of absolute or qualified immunity from suit. We agree that absolute immunity does not apply. Stinson has sued the defendants primarily for their investigative misconduct, not their testimony at trial. But the defendants remain protected by qualified immunity, which is lost only if Stinson presents evidence showing that they violated a clearly established constitutional right. He has not done so. Stinson's evidence, accepted as true, shows at most that the odontologists were negligent; it does not support his claim that they fabricated their opinions. And an error in forensic analysis—even a glaring error—is not actionable as a violation of due process. Finally, Stinson's evidence-suppression claim is wholly dependent on the allegation of fabrication, which is unsupported by the record. Accordingly, we reverse and remand with instructions to enter judgment for the defendants.

## I. Background

The immunity issue was raised at the summary-judgment stage, so our factual account of the case comes from the evidence submitted in support of and opposition to the defendants' Rule 56 motion, *see* FED. R. CIV. P. 56, construed in

Stinson's favor, *Locke v. Haessig*, 788 F.3d 662, 666–67 (7th Cir. 2015).

At about 7 a.m. on November 3, 1984, Milwaukee police were dispatched to the scene of a homicide at 2650 N. 7th Street. In the rear yard at that address, they found the body of Ione Cychosz; she had been brutally raped and murdered. The most promising physical evidence was a set of bite marks left on Cychosz's body, so the Milwaukee County Medical Examiner asked Dr. Lowell Johnson to assist on the case. Dr. Johnson was a professor of dentistry and oral surgery at Marquette University, a forensic odontologist, and a diplomate of the American Board of Forensic Odontology. At the Medical Examiner's request, Dr. Johnson examined the bite marks on Cychosz's body and made rubber impressions of them.

About two days after the murder, Milwaukee homicide detective James Gauger and his partner, Tom Jackelen, assumed responsibility for the investigation. They started by reviewing the work other officers had done to that point and meeting with Dr. Johnson, who described the killer's teeth and showed them a preliminary sketch. No police reports memorialize this meeting and the parties dispute what was said, but according to Stinson's version of events, Dr. Johnson informed the detectives of his working hypothesis: the killer had one twisted tooth and was missing the upper right lateral incisor (the tooth just to the right of the two front teeth).

Armed with this information, the two detectives began interviewing people who lived near the scene of the crime. Stinson's house was immediately to the north of the yard where the body was found. Gauger already knew Stinson. Two

years earlier, Gauger had tried and failed to prove that Stinson was responsible for the murder of a man named Ricky Johnson. The Johnson homicide was never solved, even though a witness identified Stinson and two others as having been involved. To this day, Gauger believes that Stinson was responsible for Ricky Johnson's murder.

Gauger and Jackelen went to Stinson's home and initially spoke with his mother and brother. Gauger then separately interviewed Stinson's brother while Jackelen interviewed Stinson. When they finished, the detectives compared notes outside the Stinson home. Jackelen told Gauger, "We have him." Gauger asked Jackelen what he meant, and the two detectives then returned to the house to talk with Stinson again. Jackelen's plan was to say something that would make Stinson laugh so they could see his teeth. He did so, and Gauger and Jackelen saw that Stinson was missing his right front tooth (his right central incisor) and had another tooth that was badly damaged. That did not quite match the description Dr. Johnson had given: Stinson's missing tooth was the one *just next* to the tooth that the odontologist said would be missing. Nonetheless, the detectives thought they'd found their man.

The detectives met with District Attorney E. Michael McCann and Assistant District Attorney Daniel Blinka to report the status of the investigation. Blinka summoned Dr. Johnson to the meeting, and Johnson said he would need to personally examine Stinson to determine whether his teeth matched the bite marks on Cychosz's body. Blinka did not think they had enough evidence for a warrant compelling Stinson to submit to a dental examination, so he decided to

open a John Doe proceeding—a unique procedure authorized by Wisconsin law that allows district attorneys to (among other things) subpoena witnesses to appear and give evidence before a judge in order to determine whether probable cause exists to charge someone with a crime. *See* WIS. STAT. § 968.26. On Blinka's petition a Milwaukee County Circuit Judge opened a John Doe proceeding to investigate the Cychosz murder.

Stinson was subpoenaed and on December 3 submitted to examination at a hearing before the John Doe judge. Dr. Johnson evaluated him on the spot and stated that his teeth were consistent with the bite marks on Cychosz's body. The judge overseeing the hearing ordered Stinson to submit to a more thorough dental examination, including the production of molds, wax impressions, and photographs of his teeth. Dr. Johnson's conclusion at the end of this more detailed analysis was the same: Stinson's teeth matched the bite marks on the victim.

Blinka was not quite convinced and wanted a second opinion. So Johnson and Gauger flew to Las Vegas to meet with Dr. Raymond Rawson, a forensic odontologist on the staff of the Clark County Coroner's Office in Nevada. Dr. Rawson was also an adjunct professor of biology at the University of Las Vegas and, like Dr. Johnson, a diplomate of the American Board of Forensic Odontology. Dr. Rawson had not been involved in the case to that point but agreed to examine the evidence and possibly render an opinion. After a brief look at the evidence in Gauger's hotel room, Dr. Rawson agreed with Dr. Johnson's opinion that Stinson's dentition matched the bite marks on Cychosz's body.

This corroboration satisfied Blinka. Stinson was arrested and charged with Cychosz's murder. The bite-mark evidence was the centerpiece of the prosecution, and Drs. Johnson and Rawson were the star witnesses. Before trial the prosecutor gave all the bite-mark evidence to Stinson's counsel and also provided a list of forensic odontologists available to the defense to independently review the bite-mark evidence and render an opinion. Indeed, Stinson's counsel hired one of these odontologists, but to no avail: The expert agreed with Drs. Johnson and Rawson that the bite-mark evidence implicated Stinson, so the defense attorney did not call him to testify at trial. On December 12, 1985, a jury found Stinson guilty. He was sentenced to life in prison.

Twenty-three years later, Stinson was exonerated with help from the Wisconsin Innocence Project after it was shown that DNA evidence collected from Cychosz's body excluded Stinson. The Innocence Project also enlisted a new panel of odontologists who reexamined the bite-mark evidence and determined that it too excluded Stinson. On January 30, 2009, the judgment was vacated and Stinson was released from prison. Not long after that, state experts matched the DNA evidence recovered from Cychosz's body with a DNA sample from Moses Price, who thereafter confessed to the murder. The charges against Stinson were dismissed.

In 2010 Gauger copyrighted a memoir entitled *The Memo Book*, recounting his life as a Milwaukee police officer and detective. In it he described the Ricky Johnson and Ione Cychosz homicide investigations and revealed for the first time that he and Jackelen had met with Dr. Johnson before they

began canvassing the neighborhood around the Cychosz murder scene.

After his release from prison, Stinson filed this civil-rights lawsuit against Gauger and Drs. Johnson and Rawson alleging that they conspired to frame him for the Cychosz murder. He retained a new expert odontologist, Dr. C. Michael Bowers, who agreed with the Innocence Project panel that the bite-mark evidence clearly excluded Stinson. Dr. Bowers and the panel also agreed that the forensic evaluations by Drs. Johnson and Rawson fell far below any accepted standard of forensic odontology. In Dr. Bowers's view, Drs. Johnson and Rawson went to great lengths to fit the bite-mark evidence to Stinson's dentition. Relying heavily on Dr. Bowers's opinion, Stinson alleges in his suit that Drs. Johnson and Rawson fabricated evidence against him (namely, their expert opinions), that Gauger solicited or conspired with them to do so, and that all three defendants covered up the fabrication. The fabrication claim rests on *Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012); the cover-up claim alleges that the defendants violated the due-process disclosure duty announced in *Brady v. Maryland*, 373 U.S. 83 (1963).

The defendants moved for summary judgment based on absolute immunity, or alternatively, qualified immunity from suit. The district judge rejected the claim of absolute immunity because Stinson's fabrication claim focused on misconduct that occurred during the investigation, before the case was charged, and not on the defendants' role as witnesses at trial. The judge also rejected the claim of qualified immunity, concluding that Dr. Bowers's affidavit, along with Gauger's belief that Stinson

was responsible for the still-unsolved Ricky Johnson homicide, supported Stinson's claim that the defendants conspired to frame him. The judge accordingly denied summary judgment. All three defendants appealed.

## II. Discussion

### A. Appellate Jurisdiction

An order denying summary judgment normally lacks the finality required for appellate jurisdiction under 28 U.S.C. § 1291, *Gutierrez v. Kermon*, 722 F.3d 1003, 1009 (7th Cir. 2013), but orders denying claims of immunity from suit are an exception, *Mitchell v. Forsyth*, 472 U.S. 511, 524–30 (1985). These orders are effectively final with respect to the defendant's right to avoid the burdens of litigation and trial, so appellate jurisdiction arises under § 1291 pursuant to the collateral-order doctrine, which permits immediate appeal of a "small class" of orders that "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Id.* at 524–25 (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)).

This principle is subject to an important limitation, however. In *Johnson v. Jones*, the Supreme Court explained that "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." 515 U.S. 304,

319 (1995). The plaintiff in *Johnson* alleged that five police officers used excessive force during an arrest, beating him so severely that he required hospitalization for broken ribs. *Id.* at 307. Three of the officers moved for summary judgment, asserting qualified immunity and arguing that the plaintiff had no evidence that any of them were involved in the beating. *Id.* at 307–08. Relying on the plaintiff's statement that some unidentified officers beat him and the officers' deposition admissions that they had been present at the scene, the district court determined that the plaintiff had raised a genuine factual dispute about whether these particular officers participated in the beating and on that basis denied the qualified-immunity motion. *Id.* The officers appealed, arguing that the summary-judgment record did not support the plaintiff's version of the facts. *Id.* at 308. Because the district court's ruling entailed only a determination of the sufficiency of the evidence—a purely factual question—the Supreme Court held that it was not immediately appealable. *See id.* at 313–17.

At first blush *Johnson* might be seen as foreclosing this appeal, but the Court's decision must be read in light of its later decisions in *Scott v. Harris*, 550 U.S. 372 (2007), and *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014). At issue in *Scott* was whether a police officer used excessive force when he rammed the plaintiff's fleeing car during a high-speed chase, a question that turned in part on whether a reasonable officer would have believed that the plaintiff's flight posed a danger to the public. The district court denied the officer's claim of qualified immunity, holding that a jury could side with the plaintiff and find that a reasonable officer would not have believed that the plaintiff's flight posed a threat to the safety of others. *See*

*Harris v. Coweta County*, No. CIVA 3:01CV148 WBH, 2003 WL 25419527, at *5 (N.D. Ga. Sept. 25, 2003). The Eleventh Circuit affirmed, *Harris v. Coweta County*, 433 F.3d 807, 816 (11th Cir. 2005), but the Supreme Court reversed, holding that the plaintiff's story was "blatantly contradicted by the record," which included a video recording of the chase. 550 U.S. at 380.

The qualified-immunity question in *Scott* therefore turned on a pure question of law: "whether [the officer's] actions were objectively reasonable" under the Fourth Amendment in light of the danger created by the plaintiff's high-speed flight, as captured on the video recording. *Id.* at 381. The Court had "little difficulty" concluding that "it was reasonable for [the officer] to take the action that he did." *Id.* at 384.

The Court's opinion in *Scott* does not mention *Johnson*, but the decision inescapably implies that *Johnson* should not be read too expansively. The Court made this point explicit in *Plumhoff*, which specifically addressed the limits of *Johnson*'s no-jurisdiction holding in light of *Scott*. *Plumhoff*, like *Scott*, involved a high-speed police chase: The claim in *Plumhoff* was that police used excessive force by shooting at a fleeing car. 134 S. Ct. at 2017–18. Like the district court in *Scott*, the district court in *Plumhoff* found a genuine factual dispute about the degree of danger posed by the driver and thus rejected the officers' claim of qualified immunity. Applying *Johnson*, the Sixth Circuit initially determined that it lacked jurisdiction to hear the officers' appeal, but the court later reversed course and affirmed the district court on the merits. *Id.*

The Supreme Court reversed. Addressing the question of appellate jurisdiction, the Court explained that unlike the

officers in *Johnson*, the officers in *Plumhoff* weren't contesting a purely factual issue; instead, they raised a question of law. *Id.* at 2019. They did not claim, for example, "that other officers were responsible for [the] shooting … ; rather, they contend[ed] that their conduct did not violate the Fourth Amendment and, in any event, did not violate clearly established law." *Id.* In other words, they acknowledged for purposes of their summary-judgment motion that they had fired shots at the fleeing car, but they argued that the shooting was a reasonable response to the danger the high-speed chase created, or in the alternative, that a reasonable officer would not have known that the shooting was unjustified in light of that danger.

The Supreme Court explained that these were "legal issues … quite different from any purely factual issues that the trial court might confront if the case were tried." *Id.* As such, the Court held that *Johnson* did not apply. *Id.* The Court went on to conclude that the case was indistinguishable from *Scott*, and the record unequivocally showed that the driver posed a serious risk to public safety, justifying the officers' actions. *See id.* at 2021–22. Alternatively, the Court held that the officers were entitled to qualified immunity. *Id.* at 2024.

*Scott* and *Plumhoff* make it clear that *Johnson* should not be understood as establishing a categorical bar to immediate appellate review of an order denying immunity whenever the lower court has determined that facts are in dispute. The jurisdictional inquiry requires a more nuanced assessment of the specific immunity claim asserted in the case to determine whether the appeal raises a question of law, as in *Plumhoff* and

*Scott*, or merely a dispute about historical facts, as in *Johnson*. Here, the defendants have accepted Stinson's version of the historical facts for present purposes; they argue that those facts, even with inferences drawn in Stinson's favor, do not amount to a violation of a clearly established constitutional right. That is the legal question at the heart of a qualified-immunity claim. The district court's order qualifies for immediate appeal.

## B. Absolute Immunity

Our jurisdiction secure, we begin with the odontologists' claim of absolute immunity. Witnesses have absolute immunity from suit on claims stemming from their testimony at trial and, as a corollary, from their preparation to testify at trial. *See Rehberg v. Paulk*, 132 S. Ct. 1497, 1506–07 (2012); *Briscoe v. LaHue*, 460 U.S. 325, 326 (1983). Even if Johnson and Rawson testified falsely at Stinson's trial, that testimony can't be the basis of a civil suit against them. The principle underlying this expansive immunity is that without it, witnesses might be reticent to testify or might hedge their testimony to reduce the chance of a retaliatory or harassing lawsuit against them. *See Rehberg*, 132 S. Ct. at 1505. Moreover, civil liability is not considered necessary to deter false testimony; the threat of criminal prosecution for perjury is a sufficient deterrent. *See id.*

Drs. Johnson and Rawson argue that all of Stinson's claims arise from their trial testimony or its preparation. Not so. Stinson's claims focus primarily on actions the two odontologists took while *investigating* the Cychosz murder.

That's a key distinction in the context of absolute immunity. In *Buckley v. Fitzsimmons*, or *Buckley III* as it's known in this circuit, the Supreme Court held that a prosecutor's absolute immunity covers allegations of misconduct committed during trial and in preparing for trial, but not misconduct committed while investigating the case. 509 U.S. 259, 273 (1993). "There is a difference," the Court said, "between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand." *Id.* A prosecutor who participates in a criminal investigation performs essentially the same function as a detective, so as a useful shorthand, the Court held that a prosecutor's conduct before probable cause exists ordinarily should be classified as investigative work rather than trial preparation, and as such is not covered by absolute immunity. *See id.* at 274.

Even after probable cause exists, a prosecutor might continue acting as an investigator, in which case absolute immunity remains inapplicable. *See id.* at 274 n.5. Whether this investigative work is later used at trial is irrelevant: "A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial." *Id.* at 276.

If a prosecutor isn't absolutely immune for misconduct occurring during an investigation, before probable cause exists,

then it's hard to see how a forensic expert working with the prosecutor to develop probable cause would be protected by absolute immunity. The immunities for prosecutors and witnesses derive from the same common-law immunity that covers all essential participants in a trial, and both exist to protect the truth-seeking function of trials by allowing participants to speak and act freely without threat of civil liability. *See Briscoe*, 460 U.S. at 334–36 & n.15.

Indeed, the Supreme Court recently noted, if only in passing, that the distinction drawn in *Buckley III*—between alleged misconduct during trial and trial preparation (for which a prosecutor is absolutely immune) and alleged misconduct during an investigation (for which a prosecutor has only qualified immunity)—applies to witnesses as well. In *Rehberg* the Court held that a witness is entitled to absolute immunity for his testimony before a grand jury and for preparing grand-jury testimony. 132 S. Ct. at 1507. The Court was careful to note, however, that absolute immunity does not extend "to *all* activity that a witness conducts outside of the grand jury room. For example, we have accorded only qualified immunity to law enforcement officials who falsify affidavits … and fabricate evidence concerning an unsolved crime." *Id.* at 1507 n.1 (citing, among other cases, *Buckley III*, 509 U.S. at 272–76).

Here, Stinson accuses the odontologists of fabricating their opinions during the investigative phase of the Cychosz case, *before* probable cause existed. In light of *Rehberg* and the principles outlined in *Buckley III*, absolute immunity does not apply to this alleged misconduct.

Finally, we note that absolute immunity does not protect a witness who violates a *Brady* obligation by suppressing material exculpatory information concerning the investigation of a crime. *See Manning v. Miller*, 355 F.3d 1028, 1033 (7th Cir. 2004) (holding that absolute immunity did not apply to witnesses accused of concealing their fabrication of evidence); *Ienco v. City of Chicago*, 286 F.3d 994, 1000 (7th Cir. 2002) ("Neither the withholding of exculpatory information nor the initiation of constitutionally infirm criminal proceedings is protected by absolute immunity.").

## C. Qualified Immunity

Although not absolutely immune from suit, the defendants remain protected by qualified immunity unless Stinson has evidence showing that their conduct violated a constitutional right and the right was clearly established at the time of their actions. *See Pearson v. Callahan*, 555 U.S. 223, 243–44 (2009). Relying on *Whitlock*, he alleges that the odontologists violated his Fourteenth Amendment right to due process by fabricating their bite-mark opinions and that all three defendants took part in a conspiracy to frame him with this fabricated evidence. He also alleges that the defendants engaged in a cover-up by suppressing evidence of the fabrication in violation of *Brady*.

### 1. *Fabrication of Evidence*

The core of Stinson's case is his contention that Drs. Johnson and Rawson falsified their expert opinions and that Gauger solicited or conspired with them to do so. Recent

cases in this circuit hold that a prosecutor who fabricates evidence against a suspect and later uses that evidence to convict him violates due process, and this due-process right was clearly established by at least the early 1980s. *See Fields v. Wharrie* ("*Fields II*"), 740 F.3d 1107, 1114 (7th Cir. 2014); *Whitlock*, 682 F.3d at 585–86. The constitutional violation occurs when the evidence is fabricated, not when the fabricated evidence is later introduced at trial—a crucial distinction because the prosecutor would have absolute immunity for any constitutional violation committed during the trial. *See, e.g., Fields v. Wharrie* ("*Fields I*"), 672 F.3d 505, 517–18 (7th Cir. 2012); *Buckley v. Fitzsimmons* ("*Buckley IV*"), 20 F.3d 789, 794–95 (7th Cir. 1994).

It's not entirely clear that the same reasoning applies to police officers and expert witnesses who are alleged to have fabricated evidence during an investigation. Unlike prosecutors, police investigators face liability for failing to disclose their own fabrication of evidence. *See, e.g., Manning*, 355 F.3d at 1034. That's because immunity doesn't protect an officer who fails to disclose material exculpatory evidence as required by *Brady*, *see id.* at 1033, even though a prosecutor who did the same thing would have absolute immunity for the suppression, *see Fields I*, 672 F.3d at 514.

Moreover, a line of cases in this circuit has squarely held that a police officer's fabrication of evidence (as distinct from his suppression of material exculpatory evidence) is not actionable as a violation of due process as long as state law provides an adequate remedy for the fabrication—usually in the form of a malicious-prosecution tort action. *See, e.g.,*

*McCann v. Mangialardi*, 337 F.3d 782, 786 (7th Cir. 2003). Under these cases due process is satisfied as long as the state permits a suit against the culpable officer after the fact. *See id.*; *Newsome v. McCabe*, 256 F.3d 747, 750–51 (7th Cir. 2001). *Whitlock* did not address this line of cases. If they remain good law, then the due-process claim against prosecutors recognized in *Whitlock* and applied in *Fields II* might not be available against police officers (and other members of the investigative team, like forensic experts) unless state law lacks an adequate tort remedy for the fabrication of evidence.

We don't need to resolve this question, however, because Stinson's claims fail even assuming *Whitlock* and *Fields II* apply to state actors other than prosecutors. *See Petty*, 754 F.3d at 421–22 (declining to address the relationship between *McCann* and *Whitlock* because plaintiff's claims failed even if *Whitlock* applied to police officers). The due-process liability recognized in *Whitlock* arises only in a narrow category of cases involving evidence fabrication; the panel took care to distinguish constitutionally actionable fabrication claims from other forms of official wrongdoing—such as "[c]oercively interrogating witnesses, paying witnesses for testimony, and witness-shopping." 682 F.3d at 584. The latter "may be deplorable, and … may contribute to wrongful convictions, but they do not necessarily add up to a constitutional violation even when their fruits are introduced at trial." *Id.*

*Whitlock* thus distinguished this court's earlier decision in *Buckley IV*, which rejected a due-process claim based on allegations that investigators coerced and solicited false testimony. *Buckley* involved a prosecutor who had been told by

three different experts that a bootprint left at the scene of the crime could not reliably implicate Buckley, but sought a fourth opinion from an expert who had a reputation for producing scientifically unreliable opinion testimony. 20 F.3d at 796. She told the prosecutor and investigators "that no one but Buckley could have left the bootprint on the door—and that she could identify the wearer of a shoe with certainty even if she had only prints made with different shoes." *Id.* We explained in *Buckley IV* that "[n]either shopping for a favorable witness nor hiring a practitioner of junk science is actionable" as a constitutional violation; a due-process violation occurs, if at all, only when the testimony is offered at trial without compliance with *Brady*. *Id.* at 796–97.

*Whitlock* did not disagree with *Buckley IV* on this point. Instead the panel distinguished shopping for unreliable experts (among other wrongful conduct at issue in *Buckley IV*) from the evidence falsification at issue in *Whitlock*, which involved feeding witnesses details of crimes that they couldn't have known. *See Whitlock*, 682 F.3d at 572, 584. Why the distinction? Because "[e]vidence collected with the[] kind[] of suspect techniques [at issue in *Buckley IV*], unlike falsified evidence and perjured testimony, may turn out to be true." *Id.* at 584. Sorting out reliable and unreliable evidence is an ordinary matter for trial, through the crucible of the adversary process, so the use of these suspect techniques doesn't violate due process unless the evidence is introduced at trial without adequate safeguards, such as disclosure of all material exculpatory evidence as required by *Brady*. Subsequent cases have confirmed that the due-process cause of action recognized in *Whitlock* is factually limited to cases involving evidence

*fabrication*. *See Petty*, 754 F.3d at 422–23; *see also Fields II*, 740 F.3d at 1112.

Although Stinson tries to situate his case in this category, the record on summary judgment, construed generously in his favor, doesn't come close to showing that Drs. Johnson and Rawson fabricated their expert opinions. The district judge thought a jury could find fabrication based on Dr. Bowers's opinion that "Johnson's and Rawson's conclusions were far afield of what a reasonable forensic odontologist would have concluded." This view reflects an incorrect understanding of the fabrication claim recognized in *Whitlock*. Nothing in *Whitlock* or *Fields II* suggests that an inference of fabrication can be drawn from an expert's opinion that another expert behaved *unreasonably* under prevailing standards in the field. Arriving at an unreasonable expert opinion may suggest negligence, perhaps even gross negligence, but it does not amount to the intentional *fabrication* of evidence. A mistake in forensic analysis—even an egregious mistake—is grievous given the stakes in this context, but an expert who renders a mistaken opinion is protected by qualified immunity. Fabricated opinion evidence, for which the expert might not have qualified immunity, must be both wrong and *known to be wrong* by the expert. *See Fields II*, 740 F.3d at 1110.

Stinson places special emphasis on the discrepancy between Dr. Johnson's early hypothesis—that the murderer was missing the right lateral incisor—and his ultimate opinion that Stinson's dentition matched the bite marks on Cychosz's body. (Recall that Stinson was missing his right *central* incisor, the tooth just next to the right lateral incisor.) This discrepancy

suggests that forensic odontology is not very precise (raising legitimate questions about its reliability), but it's not evidence that Dr. Johnson *knew* his opinion was false—i.e., that it was a *lie*.

We acknowledge that it's not easy to prove that an expert knowingly falsified an opinion. We also recognize that the first step toward proving that an expert was intentionally lying is proving that his opinion was wrong. But to conclude that an expert fabricated his opinion *solely* because it was wrong—even grossly wrong—would collapse the essential distinction between mistaken opinions (for which there is immunity) and fabricated opinions (for which there is not). Stinson's fabrication claim is based entirely on the opinions of new experts that Drs. Johnson and Rawson were terribly wrong about the bite-mark evidence and that they used unreliable methods falling far below the standards of their profession. We do not second-guess this new opinion evidence, but it demonstrates at most that the odontologists acted unreasonably, not that they fabricated their opinions. Stinson has nothing else to support his evidence-fabrication claim.

The related claim against Gauger is entirely dependent on the viability of the evidence-fabrication claim against the odontologists. Stinson contends that the detective solicited or conspired with Drs. Johnson and Rawson to falsify their opinions, or at least failed to intervene to prevent them from doing so. Because no reasonable jury could find that the odontologists violated Stinson's due-process rights by fabricating their opinions, Gauger too is entitled to qualified immunity on this claim.

**2.** *Suppression of Evidence*

Stinson also claims that the defendants suppressed evidence in violation of the due-process disclosure duty announced in *Brady v. Maryland*, 373 U.S. 150 (1972), and expanded in *Giglio v. United States*, 405 U.S. 150 (1972). The duty to disclose material exculpatory and impeachment evidence extends to prosecutors and "others acting on the government's behalf in the case." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). Thus, police officers who conceal exculpatory evidence, or who fabricate evidence and fail to disclose the fabrication, cannot claim the protection of qualified immunity. *See, e.g.*, *Newsome*, 256 F.3d at 752–53; *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988). We've suggested before that the same reasoning applies in cases involving forensic experts who work with the police on criminal investigations. *See, e.g.*, *Jones*, 856 F.2d at 993 (upholding a jury verdict against a lab technician who manipulated and concealed exculpatory evidence). We need not decide whether it was clearly established in 1984, when these events occurred, that forensic experts working with the police have a duty to disclose material exculpatory evidence; nothing in the record shows that the duty was violated in Stinson's case.

The *Brady* rule is not violated by the presentation of flawed expert testimony at trial. *See, e.g.*, *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1029 (7th Cir. 2006); *Buie v. McAdory*, 341 F.3d 623, 625–26 (7th Cir. 2003). Faulty expert testimony is exposed through the adversary process; the *Brady* requirement simply ensures that the defense has all material exculpatory

evidence for use during cross-examination. Here, the prosecutor disclosed all the bite-mark evidence to the defense and even provided a list of forensic odontologists to assist Stinson's counsel in preparing to contest Dr. Johnson's and Dr. Rawson's opinions. Far from exposing flaws in their analysis, Stinson's forensic expert *agreed* that they had correctly evaluated the bite-mark evidence and that it inculpated Stinson. So Stinson's own expert missed the errors later identified by the Innocence Project and Dr. Bowers.

What's left is Stinson's allegation that Dr. Johnson failed to disclose that he changed his mind about which tooth the killer was missing. But the prosecution turned over Dr. Johnson's initial sketch to the defense, and the inconsistency between it and his subsequent opinion was just as evident then as it is today. *See Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008) ("There was nothing preventing Carvajal from discovering and drawing out this discrepancy between the officers' stories during the suppression hearing. Suppression does not occur when the defendant could have discovered it himself through 'reasonable diligence.'" (quoting *Ienco v. Angarone*, 429 F.3d 680, 683 (7th Cir. 2005)). If the discrepancy was relevant in assessing the quality or accuracy of Dr. Johnson's ultimate opinion, then Stinson and his expert could have seized on the point at the time.

We have difficulty discerning what other evidence Stinson thinks was concealed. He hasn't pointed to any material evidence that has recently come to light but wasn't disclosed in time for his trial. He points to Gauger's memoir, which was copyrighted in 2010, but the material information in *The Memo*

*Book*—such as Gauger's belief that Stinson was responsible for Ricky Johnson's murder—was known at the time of trial. The only new fact revealed in *The Memo Book* was that Gauger and Jackelen met with Dr. Johnson prior to canvassing the neighborhood where the Cychosz murder occurred. The mere fact of that meeting is not materially exculpatory.

### 3. *Remaining Claims Against the Odontologists*

Stinson's remaining claims against Drs. Johnson and Rawson are wholly dependent on his primary contention that they fabricated their opinions and suppressed evidence of the fabrication. For example, Stinson alleges that the odontologists are liable for conspiracy, but a defendant cannot be liable "for conspiring to commit an act that he may perform with impunity." *House v. Belford*, 956 F.2d 711, 720 (7th Cir. 1992). For the same reason, Stinson's claim against the odontogists for failure to intervene also fails.

### III. Conclusion

For the foregoing reasons, the defendants are not protected by absolute immunity, but they are entitled to qualified immunity. Accordingly, we REVERSE the judgment of the district court and REMAND with instructions to enter judgment in favor of the defendants.