# United States Court of Appeals
## For the First Circuit

No. 16-1486

MARK S. REENSTIERNA; T.H. REENSTIERNA, LLC,

Plaintiffs, Appellants,

v.

KENNETH D. CURRIER,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph N. Laplante, U.S. District Judge]

Before

Lynch, Lipez, and Barron,
Circuit Judges.

Richard B. Reiling, with whom Bottone Reiling was on brief,
for appellant.
Russell F. Hilliard, with whom Upton & Hatfield, LLP was on
brief, for appellee.

October 13, 2017

**LIPEZ**, <u>**Circuit Judge**</u>. Plaintiff-appellant Mark Reenstierna, a real estate appraiser, was the subject of a disciplinary hearing before the New Hampshire Real Estate Appraisal Board ("the Board"). In that hearing, the Board considered as evidence a report on Reenstierna's work written at the Board's request by defendant-appellee Kenneth Currier. After convincing the Board to reconsider an earlier unfavorable decision and dismiss the grievance charges, Reenstierna sued Currier, accusing him of defamation and other torts. The district court granted summary judgment in favor of Currier, concluding that New Hampshire's absolute witness immunity rule extends beyond testimony provided at an administrative hearing to include statements in the report that Currier prepared for the Board. We affirm.

## I.

Reenstierna, the president of Reenstierna LLC, works as a real estate appraiser and consultant in New York and New England, specializing in the appraisal of gas stations and convenience stores. Currier, also a real estate appraiser with expertise in gas stations and convenience stores, is licensed in Maine, Massachusetts, New Hampshire, and New York. The two men are the top "go-to" people in the region for parties seeking such appraisals.

- 2 -

Cumberland Farms, a gas station and convenience store chain, hired Reenstierna in early 2010 to appraise one of its properties in the city of Rochester that was the subject of a taking by the New Hampshire Department of Transportation. Reenstierna provided his appraisal to Cumberland Farms in March. On the signature line of the appraisal next to his then-expired New Hampshire Certified General Real Estate Appraiser licensing number, Reenstierna included a parenthetical notation that said, "Renewing."[1]

Specifically citing Reenstierna's appraisal of the Cumberland Farms site, an employee of the New Hampshire Department of Transportation filed an anonymous grievance against Reenstierna with the Board in September 2011, complaining that he was working as a real estate appraiser without the necessary licensure. The Board subsequently voted to investigate the complaint and appointed a complaint officer, Mark Correnti, who asked Currier to provide a report on Reenstierna's Cumberland Farms appraisal.

At the time Correnti hired him, Currier was a competitor of Reenstierna's throughout New England, including in New Hampshire. Currier had previously performed approximately twenty

---

[1] Although Reenstierna may have been indicating to Cumberland Farms that he had personally begun the process of renewing his then-expired license, there is no formal designation of "Renewing" in New Hampshire. An appraiser either possesses a valid license or does not.

appraisals for Cumberland Farms over the preceding decade and remained on Cumberland Farms' list of approved appraisers from whom the company would accept bids.[2]

In addition to faulting Reenstierna for performing the appraisal without a license, Currier's report criticized the quality of the appraisal itself, citing six flaws. After receiving Currier's report, Correnti attempted to resolve the grievance against Reenstierna informally in accordance with Board rules. When Reenstierna rejected Correnti's proposal that he surrender his license, Correnti recommended to the Board that it proceed with a disciplinary hearing. The Board accepted the recommendation, and a hearing was held in July of 2012.

Initially, the Board ruled that Reenstierna had violated the Uniform Standards of Professional Appraisal Practice's "Ethics Rule," which bars an individual from indicating that he is a licensed appraiser when he is not.[3] The Board officially "reprimanded" Reenstierna in a "Final Decision and Order." It further ordered him to (1) pay an "administrative fine in the

---

[2] Since preparing the report on Reenstierna's work for the Board, Currier has appraised at least one property for Cumberland Farms, in 2015.

[3] The Board also determined that the qualitative flaws that Currier flagged in Reenstierna's appraisal were "minor" and that the complaint officer charged with "prosecut[ing]" the grievance against Reenstierna "failed to meet [his] burden of proof on these issues beyond a reasonable doubt."

amount of $1,000"; (2) "complete a 15-hour [industry standards] course"; (3) "furnish a copy of the Final Decision and Order to any current employer for whom [he was] perform[ing] services" within ten days; and (4) "furnish [for the following year] a copy of [the] Final Decision and Order to any employer to which [he] may apply for work as an appraiser or for work in any capacity which requires appraisal knowledge." The Board also "ordered that [the] Final Decision and Order shall become a permanent part of . . . Reenstierna's file, which is maintained by the Board as a public document."

The disciplinary sanctions were stayed in December 2012, however, after Reenstierna filed a motion asking the Board to reconsider its findings. In April 2013, the Board notified Reenstierna that it was dismissing the original complaint against him, stating that the evidence and testimony presented were not sufficient to establish the presence of professional misconduct.

In February 2014, Reenstierna filed a diversity suit against Currier in the United States District Court for the District of New Hampshire, alleging that Currier had (1) violated New Hampshire's Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A; (2) defamed Reenstierna; and (3) tortiously interfered with Reenstierna's advantageous business relations. Specifically, he alleged that Currier knowingly and purposely submitted a false report to the Board and that each of the purported deficiencies

cited against Reenstierna in Currier's report constituted material misrepresentations of fact. He further contended that Currier falsely certified in his report to the Board that he had "no personal interest with respect to the parties involved" or any "bias with respect . . . to the parties involved with the assignment."

The district court granted Currier's motion for summary judgment, concluding that New Hampshire's absolute witness immunity doctrine precluded the use of Currier's report to establish liability on Reenstierna's claims.[4] Reenstierna timely appealed. We review a district court's grant of summary judgment de novo, construing the evidence and all reasonable inferences in the light most favorable to the non-moving party -- here, Reenstierna. Audette v. Town of Plymouth, 858 F.3d 13, 20 (1st Cir. 2017). "Summary judgment is appropriate where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine

---

[4] The district court actually expressed its ruling somewhat differently, stating that "the court finds that Currier is absolutely immune from a suit based on his acceptance of the assignment to review Reenstierna's appraisal and his analysis of that appraisal." In reality, however, New Hampshire's absolute witness immunity doctrine does not provide blanket immunity from suit. Instead, the New Hampshire Supreme Court has held that the doctrine precludes the use of certain statements in support of a theory of liability. See, e.g., Provencher v. Buzzell-Plourde Assocs., 711 A.2d 251, 256 (N.H. 1998); Pickering v. Frink, 461 A.2d 117, 119 (N.H. 1983); McGranahan v. Dahar, 408 A.2d 121, 124 (N.H. 1979).

issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Id. at 19 (quoting Mulloy v. Acushnet Co., 460 F.3d 141, 145 (1st Cir. 2006)).

## II.

To resolve this case, we must decide if the district court correctly applied New Hampshire's absolute witness immunity doctrine. If it applies to the statements in Currier's report, we must affirm. If it does not apply, we must vacate the judgment so that Reenstierna can use the statements in the report in a trial of his claims against Currier.

### A. New Hampshire's Law of Absolute Witness Immunity

"The ability of courts, under carefully developed procedures, to separate truth from falsity, and the importance of accurately resolving factual disputes in criminal (and civil) cases are such that those involved in judicial proceedings should be 'given every encouragement to make a full disclosure of all pertinent information within their knowledge.' . . . For a witness, this means he must be permitted to testify without fear of being sued if his testimony is disbelieved." Imbler v. Pachtman, 424 U.S. 409, 439 (1976) (White, J., concurring) (quoting 1 F. Harper & F. James, The Law of Torts § 5.22, p. 424 (1956)). In order to effectuate such full disclosure, the common law has traditionally acknowledged the importance of "provid[ing] absolute immunity from subsequent damages liability for all persons --

governmental or otherwise -- who were integral parts of the judicial process." Briscoe v. LaHue, 460 U.S. 325, 335 (1983).

Consistent with these concerns, New Hampshire has long recognized that "statements made in the course of judicial proceedings are absolutely privileged from liability in civil actions." Pickering v. Frink, 461 A.2d 117, 119 (N.H. 1983) (citing McGranahan v. Dahar, 408 A.2d 121, 124 (N.H. 1979)). This absolute privilege "is tantamount to an immunity. It is not conditioned on the actor's good faith." McGranahan, 408 A.2d at 124.

Invoking Briscoe, the New Hampshire Supreme Court most recently addressed the extent of witness immunity, and whether it should reach beyond the walls of a courtroom, in Provencher v. Buzzell-Plourde Assocs., 711 A.2d 251, 255 (N.H. 1998). Plaintiff Arthur Provencher had initially agreed to sell his property to the state for a highway project. Id. at 253. If the parties could not negotiate a satisfactory price, however, the state was entitled to take Provencher's property by eminent domain. Id. New Hampshire thus hired two real estate appraisal firms, both of which valued Provencher's land at $1 million. Provencher claimed that his land was in fact worth $7 million and refused to sell his property. Id. The state's appraisers testified at a subsequent condemnation hearing, where a jury ultimately valued Provencher's property at $4 million.

Provencher sued the government's appraisers, alleging that they had breached various duties owed to him as an intended third-party beneficiary of their contract with the state.  Id. The defendants argued that their appraisal, any statements made in preparation for the hearing, and their testimony at the hearing were protected by absolute witness immunity.  Id.  Provencher contended that even if the appraisers' testimony at the disciplinary hearing was protected by witness immunity, their pre-hearing statements and reports were beyond the doctrine's safe harbor.  Id.

In deciding to extend witness immunity beyond testimony at the judicial proceeding, the New Hampshire Supreme Court heeded the counsel of the Supreme Court of Washington, "recogniz[ing] that 'an expert's courtroom testimony is the last act in a long, complex process of evaluation and consultation with the litigant.'"  Id. at 255 (quoting Bruce v. Byrne-Stevens & Assocs. Eng'rs, 776 P.2d 666, 672 (Wash. 1989)).  Noting that "it is difficult to distinguish an expert witness's testimony from the acts and communications upon which it is based," id., the court again quoted Bruce:

> The privilege or immunity is not limited to what a person may say under oath while on the witness stand. It extends to statements or communications in connection with a judicial proceeding.  . . . If this were not so, every expert who acts as a consultant for a client with reference to proposed or actual

- 9 -

litigation, and thereafter appears as an expert witness, would be liable to suit at the hands of his client's adversary on the theory that while the expert's testimony was privileged, his preliminary conferences with and reports to his client were not, and could form the basis of a suit for tortious interference.

Id. (quoting Bruce, 776 P.2d at 672-73).

The court next looked to the Restatement, which provides that "[a] witness is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding or as part of a judicial proceeding in which he is testifying, if it has some relation to the proceeding." Id. at 255-56 (quoting Restatement (Second) of Torts, § 588 (1977)). Importantly, the court cited comment e of section 588, which cabins the extent of the privilege by cautioning that a witness's pre-hearing statement should only be afforded immunity if the statement "has some relation to a proceeding that is actually contemplated in good faith and under serious consideration by the witness or a possible party to the proceeding." Id. at 256 (quoting Restatement (Second) of Torts § 588 cmt. e (1977)) (emphasis added in Provencher). Comment e further cautions that "[t]he bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered." Id. (quoting Restatement (Second) of Torts § 588 cmt. e). Guided

- 10 -

by these authorities, the New Hampshire Supreme Court held that it would

> join those courts which have concluded that pertinent pre-litigation communications between a witness and a litigant or attorney are absolutely privileged from civil liability if litigation was contemplated in good faith and under serious consideration by the witness, counsel, or possible party to the proceeding at the time of the communication.

Id. at 256.

## B. Application

The parties do not dispute that the disciplinary hearing at issue in this case constitutes a "judicial proceeding" for the purpose of witness immunity analysis.[5] Currier argues that he is entitled to claim witness immunity because the role he played in the Board's disciplinary process is comparable to the role played by the appraisers hired by the state in Provencher. On its face, there is considerable force to Currier's argument. The appraisers in both cases participated in an administrative process provided by statute. In Provencher, the appraisers were asked to investigate the value of property designated for taking by the state in eminent domain proceedings. Id. at 253. Ideally, the appraisals commissioned by the state would provide a basis for an

---

[5] Although the hearing was technically an administrative adjudication, we use the phrase "judicial proceeding" in accordance with the New Hampshire Supreme Court's language from its case law and the Restatement (Second) of Torts.

agreement between the landowner and the state on the property's value.  Id.  If that did not happen, however, the value would have to be determined in an administrative proceeding, informed, in part, by the appraisals commissioned by the state.  Id.  In this case, as part of a disciplinary process initiated by the Board, Currier was commissioned to investigate and prepare a report on Reenstierna's possible violations of Board rules and industry standards in his Cumberland Farms appraisal.  Ideally, that report would provide a basis for a resolution of the disciplinary process through an agreement.  If that effort failed, however, the Board would conduct a disciplinary hearing, informed, in part, by Currier's report.

Reenstierna rejects this comparison on two grounds. First, he asserts that the district court erred by considering Provencher at all.  Instead, he insists that the relevant precedent is the New Hampshire Supreme Court's more recent decision in Frost v. Delaney, 128 A.3d 663 (N.H. 2015), which he says supports the proposition that the appropriate immunity analysis for Currier's statements is official immunity, rather than absolute witness immunity.  "Official immunity" under New Hampshire law is a narrower form of immunity that protects the acts and omissions of government officials.  See id. at 672 ("Under official immunity, government officials are protected from personal liability for those decisions, acts or omissions that are: (1) made within the

- 12 -

scope of their official duties while in the course of their employment; (2) discretionary rather than ministerial; and (3) not made in a wanton or reckless manner."). New Hampshire's official immunity standard is sometimes compared to the qualified immunity standard applied to federal civil rights cases filed pursuant to 42 U.S.C. § 1983. Id.

Second, Reenstierna argues that the statements in Currier's report are not protected by witness immunity because litigation was not contemplated at the time he performed the investigation and prepared his report for the Board.

**1. Official Immunity**

In Frost v. Delaney, Frost was charged with four violations of New Hampshire's mortgage licensing laws on the basis of an investigation carried out by a New Hampshire Banking Department investigator. Id. at 666-67. After the court dismissed both criminal and administrative charges against Frost, he sued the investigator under § 1983, the New Hampshire Constitution, and New Hampshire tort law. Id. at 667. The trial court dismissed the federal claims on the basis of qualified immunity, and the state constitutional and tort claims on the basis of New Hampshire's official immunity doctrine.[6] Id. at 668. Frost then

---

[6] The defendants in the trial court also raised absolute witness immunity as a defense, but the trial court did not address this defense in its decision, disposing all of the state law claims under New Hampshire's official immunity doctrine. See Frost v.

appealed the dismissal of the § 1983 claims, but not the state law claims.  Id.  The New Hampshire Supreme Court affirmed the trial court's qualified immunity determination.  Id. at 668-73.

This description of the Frost case indicates why Reenstierna's reliance on it is misplaced.  Reenstierna filed New Hampshire common law tort claims against Currier.  Frost filed a federal civil rights claim under § 1983, alleging that a government investigator violated his Fourth and Fourteenth Amendment rights under the U.S. Constitution when she misrepresented material facts on an application for a search warrant of his residence.  Id. at 667-68.  On appeal, the New Hampshire Supreme Court analyzed only the federal law doctrine of qualified immunity under § 1983.  Id. at 668-72.  It said nothing about the application of New Hampshire's doctrine of official immunity to the out-of-court statements of a government investigator.  Nor did it say anything about New Hampshire's absolute witness immunity doctrine.

Ignoring critical differences between the Provencher and Frost cases, Reenstierna asks us to conclude that the New Hampshire Supreme Court used Frost, a case applying qualified immunity to the pre-hearing statements of an investigator facing federal civil rights claims, to circumscribe by implication its carefully reasoned decision in Provencher that absolute witness immunity

---

Sheehan, No. 216-2012-CV-00603, 2014 WL 10122655 (N.H. Super. June 9, 2014).

- 14 -

applies to the pre-hearing statements of an investigator facing state tort claims. Putting aside this implausible view of judicial decisionmaking, a federal court sitting in diversity has no license to reformulate state law in the manner requested by Reenstierna.[7]

To be sure, Reenstierna's allegation -- that Currier unethically accepted the Board's invitation to act as an investigator with the intent of defaming and administratively prosecuting his prime competitor -- is a serious charge. It is perhaps understandable that Reenstierna believes that his case against Currier is more akin to the alleged civil rights violations committed by the Banking Department investigator in Frost, whose false statements led to both criminal and civil administrative charges against Frost, than it is to the negligence and fraud claims in Provencher, where the statements at issue were about the value of a parcel of land. The allegedly defamatory statements in this case could arguably inflict irreparable damage to Reenstierna's professional reputation, an injury much more severe than the mere disagreement over property value in Provencher.

---

[7] Beyond Frost, Reenstierna asks us to apply the holding of Stinson v. Gauger, 799 F.3d 833 (7th Cir. 2015), another § 1983 case, where the Seventh Circuit held that a pair of defendant-odontologists accused of falsifying their expert reports leading up to a murder prosecution could not assert absolute witness immunity. Id. at 840-41. That holding was recently reaffirmed by the court sitting en banc. See 868 F.3d 516, 528-29 (7th Cir. 2017). Reenstierna's reliance on this case, however, is similarly misguided. Stinson, like Frost, applies federal qualified immunity doctrine to a federal cause of action. Id. at 833.

- 15 -

Nevertheless, Provencher's explicit adoption of the Restatement, which provides that "[a] witness is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding," clearly indicates that the New Hampshire Supreme Court, mindful of the importance of absolute witness immunity to accurate fact-finding in civil and criminal cases, contemplated the application of that immunity to a common law tort action such as Reenstierna's. 711 A.2d at 255-56 (quoting Restatement (Second) of Torts, § 588 (1977)) (emphasis added).

Still, with Frost, Reenstierna does highlight the different treatment under New Hampshire law of the pre-hearing statements of government investigators. Investigators facing state tort claims enjoy absolute witness immunity for their pre-hearing statements. As interpreted by the Supreme Court of New Hampshire, investigators facing federal civil rights claims for their pre-hearing statements have the benefit of only qualified immunity. In the judgment of the New Hampshire Supreme Court, there may be good reasons for this distinction, or it may be problematic. Either way, this is an issue for the New Hampshire Supreme Court to address in a future case, not us.

Our dissenting colleague argues that, rather than applying the law as set out in Provencher, we should give the New Hampshire Supreme Court the opportunity to reach a different result

- 16 -

by certifying to that court the question of _Provencher_'s applicability to the circumstances of this case. Certification to the New Hampshire Supreme Court is appropriate when a question of state law is "determinative of the case" _and_ "there is no controlling precedent" from that court. _Old Republic Ins. Co. v. Stratford Ins. Co._, 777 F.3d 74, 86 (1st Cir. 2015) (citing N.H. Sup. Ct. R. 34); _see_ _also_, _e.g._, _Trull v. Volkswagen of Am., Inc._, 187 F.3d 88, 100 (1st Cir. 1999) (explaining decision to certify where "[t]he New Hampshire Supreme Court has not yet faced the issue"). On the question now before us, however, the New Hampshire Supreme Court _has_ spoken.

The _Provencher_ court expressly recognized the divergent views on whether absolute immunity "extends to communications that occur prior to the initiation of judicial proceedings," and then chose to "join those courts which have concluded that pertinent pre-litigation communications between a witness and a litigant or attorney are absolutely privileged from civil liability if litigation was contemplated in good faith and under serious consideration . . . at the time of the communication." _Provencher_, 711 A.2d at 255, 256. Assuming the good faith and "under serious consideration" prerequisites are met -- which we discuss below -- the holding of _Provencher_ squarely applies to the statements at issue here. Of course, the New Hampshire Supreme Court is free to reverse itself or distinguish _Provencher_ away. However, it is not

- 17 -

our prerogative, through the process of certification, to suggest that the New Hampshire court do so. Having chosen the federal forum for his state-law claims, the plaintiff must live with our obligation to apply New Hampshire law as it currently stands.[8]

### 2. Litigation under Serious Consideration[9]

Reenstierna argues that even if the Provencher framework applies to pre-hearing statements at issue in common law tort actions filed against state investigators such as Currier, its holding is inapplicable to this particular case because litigation was not "under serious consideration" at the time Currier conducted his investigation and wrote his report. Provencher, 711 A.2d at 256.

Reenstierna directs us to the timeline of Currier's investigation and the Board's decisionmaking process, noting that Correnti hired Currier, and Currier completed his report, before

---

[8] Because our decision to certify, or not, must turn on the current state of New Hampshire law, our colleague's lengthy discussion of Massachusetts law is not directly pertinent. As to the dangers that might be thought to attend absolute immunity, the Provencher court recognized that the protection applies "without inquiry into a defendant's motives," 711 A.2d at 255 (quoting McGranahan v. Dahar, 408 A.2d 121, 124 (N.H. 1979)), but nonetheless chose to extend full immunity to certain pre-litigation communications to "further the goals of encouraging free and unfettered testimony during judicial proceedings," id. at 256-57 (internal quotation marks omitted).

[9] That the pertinent proceeding was "contemplated in good faith" is conceded in this case, and the good-faith requirement apparently was also undisputed in Provencher, as it was not discussed.

the Board decided to initiate Reenstierna's disciplinary hearing. He also cites testimony from the Board President that the Board actually decided to commence the administrative hearing based primarily upon Currier's report. Because Currier's report induced the Board to take action, Reenstierna contends, litigation could not have been "under serious consideration" at the time it was prepared, and, hence, the report is beyond the scope of Provencher's immunity doctrine.

Reenstierna reads Provencher too narrowly. The state statute that framed the progression of the eminent domain proceedings in Provencher, the Eminent Domain Procedure Act ("EDPA"), N.H. Rev. Stat. Ann. § 498-A, is analogous to the New Hampshire regulations that structured the Board's disciplinary process involving Reenstierna. In Provencher, the New Hampshire Supreme Court noted that EDPA requires the state to hire an appraiser before it makes an offer to purchase property, and that the appraisal "often serves as the basis" of the state's initial offer. 711 A.2d at 256. The government may initiate a condemnation proceeding only after a property owner rejects the state's purchase offer. Id.

When an individual files a grievance against an appraiser such as Reenstierna, state regulations require the Board to appoint a complaint officer (here, Correnti) if the allegation in the grievance constitutes a violation of state law or the

- 19 -

Uniform Standards of Professional Appraisal Practice. N.H. Code Admin. R. Ann. Rab 203.02(b)(2) (2017).[10] When an appraisal is included as part of the complaint, as it was here, the regulations further require the complaint officer or an investigator to evaluate the appraisal for conformity with professional standards. Id. at 203.02(b)(4). Because he was not an expert in convenience store appraisals, Correnti hired Currier to perform this task. The regulations instruct the complaint officer to issue a final report, including any investigatory reports, and require the Board to either (1) dismiss the complaint; (2) accept an informal resolution if the complaint officer was able to negotiate such a resolution with the accused appraiser; (3) commence an adjudicative hearing if the evidence suggests misconduct and an informal resolution was not established; or (4) investigate the matter further. Id. at 203.02(b)(7). When Correnti hired Currier to review Reenstierna's appraisal, a judicial proceeding "was contemplated in good faith and under serious consideration" by the Board within the meaning of Provencher. 711 A.2d at 256. As the Provencher Court said, "[s]ubjecting a party's witnesses to liability for their pre-litigation statements in cases of this

---

    [10] Currier wrote his report prior to New Hampshire amending the relevant section of its Code of Administrative Regulations. Because the relevant amendments only altered the section numbering and not the substance, we cite the relevant regulations in their current form.

nature would undoubtedly have a perverse effect on the initiation and presentation of cases."  Id. at 257 (emphasis added).

Our dissenting colleague suggests that the facts here are distinguishable from Provencher with respect to the "under serious consideration" criterion because the State and property owner there had signed a pre-appraisal agreement acknowledging that eminent domain proceedings would occur if the parties could not agree on a purchase price.  That agreement, however, was merely a particularized version of the governing statutory scheme requiring appraisals and negotiation before the state may begin the condemnation process.  See N.H. Rev. Stat. § 498-A:4.

As described above, here, too, the governing framework explicitly includes a proceeding as one possible outcome after an investigatory review of a complaint involving an appraisal.  The absence of an agreement between the parties incorporating the regulatory scheme does not make a judicial proceeding merely a "bare possibility" -- the status the Restatement contrasts with "under serious consideration" -- even if such an agreement could have added to the parties' awareness that a proceeding might occur. Provencher, 711 A.2d at 256 (quoting Restatement (Second) of Torts § 588 cmt. e).  To the contrary, once an appraisal review is triggered by a complaint, the prospect of a proceeding inevitably looms large for the parties.  Hence, on the spectrum between

seriously considered and a mere possibility, the likelihood of litigation in this case is well within Provencher's scope.

### III.

After carefully considering Reenstierna's contrary arguments, we agree with the district court that Currier's statements in his report are shielded in this action by New Hampshire's absolute witness immunity doctrine as set forth in Provencher. When it decided Provencher, the New Hampshire Supreme Court explicitly noted that it was adopting an absolute witness immunity rule that applied to allegedly defamatory pre-hearing statements. Id. at 256. In this diversity action, we are bound to implement that choice.

**Affirmed.**


**--Dissenting Opinion Follows--**

**BARRON, Circuit Judge, dissenting**. There is no question that New Hampshire law confers absolute immunity on those who appear as witnesses in judicial proceedings and on those who prepare reports in anticipation of such proceedings. This case requires us to decide, however, a distinct question concerning the scope of that immunity: whether it extends to the purely investigative acts of those whom the State retains to help it decide whether to initiate the kind of judicial proceedings through which private parties may be sanctioned for their wrongdoing.

In my view, it is a mistake to answer this question in the affirmative without first finding out whether the New Hampshire Supreme Court agrees. For, while Provencher v. Buzzell-Plourde Associates, 711 A.2d 251 (N.H. 1998), construes the scope of the State's witness immunity broadly, that case simply did not involve facts that implicated the State's interest in promoting accountable government -- and guarding against investigative abuse by law enforcement officials -- in the way that the case before us necessarily does. Thus, I would certify the question of whether witness immunity applies on the facts before us to the New Hampshire Supreme Court.

## I.

On the surface, I can see how Provencher might be thought to require the dismissal of this suit on the basis of witness immunity. Provencher held, after all, that, due to the possible

- 23 -

eminent domain proceeding in the offing, litigation "was contemplated in good faith and under serious consideration" when New Hampshire requested the appraisals from the appraisers that the State had retained. Id. at 256. As a result, Provencher ruled that witness immunity protected those appraisers, such that the suit against them for what their appraisals said could not go forward. Id.

But Provencher did not conclude that witness immunity applied to protect the appraisers in that case simply because the State knew that there eventually might be a judicial proceeding -- namely, the eminent domain proceeding that the State might choose to commence. Instead, the New Hampshire Supreme Court provided a detailed explanation for why it concluded that, given the particular facts of that case, litigation was "seriously contemplated" at the time that the appraisals were prepared. See id. at 255-56. And, in doing so, Provencher described the case in terms that suggest to me that the New Hampshire Supreme Court might view quite differently a case like this one, involving as it does a claim to witness immunity for a law enforcement official's investigation into whether there was sufficient evidence of private wrongdoing to provide the predicate for initiating judicial proceedings at which discipline might be meted out.

Specifically, in Provencher, the New Hampshire Supreme Court found a judicial proceeding to be "seriously contemplated,"

such that witness immunity applied, only after first pointing to a pre-appraisal agreement between the State and the owner of the property that was the subject of the appraisals.  Id. at 256. Provencher explained that this agreement "specifically stated that if the parties could not agree on a purchase price, then the State shall initiate an eminent domain proceeding to acquire the property and determine the purchase price in accordance with [the eminent domain statute]."  Id. (emphasis added).  In addition, the New Hampshire Supreme Court noted that the property owner conceded that the agreement specifically provided that the State would commence eminent domain proceedings if voluntary negotiations between the parties failed.  Id.  And, finally, the New Hampshire Supreme Court indicated that the Eminent Domain Procedure Act made clear that the State could commence "condemnation proceedings" only after making an offer of purchase based on an appraisal.  Id.

These particular features of Provencher showed that, before the State sought the appraisals at issue, the State apparently had done whatever investigation it needed to do in order to decide that it would take the property via eminent domain, if necessary.  Otherwise, the State would not have been in a position to represent in the agreement with the property owner that it would take the property if the property owner refused to sell. Accordingly, in Provencher, there could be no doubt that -- quite apart from what the appraisals might say -- the State was

"seriously contemplating" a judicial proceeding when the appraisals at issue were prepared, as the State could only effect through a judicial proceeding the taking that it had already made clear that it was willing to pursue.

In this way, the facts of Provencher simply did not require the New Hampshire Supreme Court to decide whether it would extend witness immunity to a state-retained investigator who had been hired to investigate whether a private citizen had engaged in the kind of misconduct that could be sanctioned only through judicial proceedings. For, in such a case, involving a state investigation into possible private misconduct, the State could not -- apart from what the investigator actually found through his investigation -- have a sufficient basis for knowing whether it would have an interest in commencing a judicial proceeding at all.

Yet, in this case, we are confronted with just the kind of claim to absolute immunity for a law enforcement investigation that was not presented in Provencher. As the plaintiff in this case points out, "[the appraiser who seeks witness immunity] was serving as an investigator for the [New Hampshire Real Estate] Board, an administrative arm of the State, at the time of his subject transgressions[,]" and the Board in turn "relie[d] on the investigation to decide whether to commence a disciplinary

proceeding."[11]   Accordingly, it is not clear to me that, just because <u>Provencher</u> ruled that the appraisals in that case were prepared in contemplation of a judicial proceeding, the New Hampshire Supreme Court would conclude that this appraisal was, too.[12]

---

[11] This possible basis for distinguishing <u>Provencher</u> also was raised -- but never directly addressed -- by <u>Provencher</u> itself. One of the two arguments that <u>Provencher</u> identified as having been presented by the plaintiff in that case with respect to absolute immunity was whether that immunity applies to a report that "causes" the judicial proceeding.  <u>See</u> 711 A.2d at 253. <u>Provencher</u>, however, said nothing directly about that issue -- namely, whether the appraisals at issue "caused" the proceeding -- in the course of ruling as it did.

[12] I do not mean to suggest that, in <u>Provencher</u>, the judicial proceeding was certain to happen or that the appraisals could not play any role in determining whether it would.  The appraisals might have affected the property owner's willingness to accept the State's offer of purchase, and there would have been no need for a judicial proceeding if the property owner were willing to sell. In addition, the State could have learned something from the appraisals that could have led the State to retreat from its previously expressed commitment to acquire the land by taking it if necessary.  Nevertheless, nothing in the record suggests that the State was looking to the appraisals in order to decide whether to take the coercive action that could necessitate the relevant judicial proceeding.  The State instead was using the appraisals merely to facilitate the acquisition of the property that the State had already made clear that it was willing to pursue, through a judicial proceeding if necessary.  And that is presumably because the State's own prior investigation into the property had led it to see the need for initiating a taking in the absence of a sale. For that reason, <u>Provencher</u> is quite unlike the present case, in which the State's interest in ever initiating a judicial proceeding is seemingly entirely dependent on the outcome of the preliminary law enforcement investigation that the appraiser who seeks witness immunity has been retained by the State to carry out.

Adding to my doubts on this score is the fact that the New Hampshire Supreme Court has elsewhere stated that qualified -- and not absolute -- immunity is generally "sufficient to protect [State] officials in the exercise of their duties." Belcher v. Paine, 612 A.2d 1318, 1323 (N.H. 1992) (citing Burns v. Reed, 500 U.S. 478, 486 (1991)); see also N.H. Rev. Stat. Ann. § 99-D:1 (legislatively adopting qualified immunity for state agency officers, trustees, officials, and employees). In fact, the New Hampshire Supreme Court has even held that the one class of State law enforcement officials that it has identified as needing absolute immunity -- namely, prosecutors -- needs only a qualified immunity to protect its members in the performance of what the New Hampshire Supreme Court has described as their "purely investigative" functions. Id. at 1324-25.

The New Hampshire Supreme Court has explained in this regard that a criminal case has not entered its "judicial phase" during the period in which law enforcement is merely investigating whether a crime has been committed. Id. For that reason, the New Hampshire Supreme Court has held that there is no need to provide prosecutors with the more complete protection that flows to them -- as an offshoot of the absolute immunity that judicial officers enjoy in performing their judicial functions -- once an investigation turns up sufficient evidence of criminal wrongdoing

to provide the predicate for the criminal charges that would bring the case into its "judicial phase." Id.

In light of these aspects of New Hampshire law, it is not at all clear to me that New Hampshire would wish to give its investigating law enforcement officials an absolute rather than a qualified immunity in performing "purely investigative" duties. These law enforcement officials may well be called as witnesses in the event that their investigations turn up sufficient evidence of wrongdoing to lead the State to commence an action that would trigger what might be described as the case's "judicial phase." I am not convinced, however, that the New Hampshire Supreme Court would conclude that this fact alone necessarily entitles such investigators to witness immunity for even "purely investigative" actions. Otherwise, it would seem that even police officers could claim absolute immunity in performing their investigative functions, notwithstanding the New Hampshire Supreme Court's conclusion that qualified immunity is generally "sufficient to protect [State] officials in the exercise of their duties." Belcher, 612 A.2d at 1323 (citing Burns, 500 U.S. at 486).

Moreover, I note that a relatively recent case from Massachusetts suggests to me that it is a mistake to assume that the New Hampshire Supreme Court would treat that state's law enforcement officials as merely a species of prospective witnesses for purposes of determining whether they are entitled to absolute

(rather than merely qualified) immunity in conducting investigations into private wrongdoing. And, of course, New Hampshire has looked to Massachusetts in determining the contours of its own absolute immunity law. See McGranahan v. Dahar, 408 A.2d 121, 124 (N.H. 1979) (citing Aborn v. Lipson, 256 N.E.2d 442 (Mass. 1979)).

The case I have in mind is Dear v. Devaney, 983 N.E.2d 240 (Mass. App. Ct. 2013). It concerned whether, under Massachusetts's absolute privilege for witness statements, allegedly defamatory statements made by police officers in reporting their investigation of a nightclub's entertainment license violation were absolutely privileged. Id. at 242-45.

In that case, police officers who had been assigned to assist a state licensing board in deciding whether to suspend a nightclub's license prepared an investigative report that contained allegedly defamatory statements. Id. at 242-43. After the police officers provided their report to the licensing board, a disc jockey who the report said was operating a promotion company that was staging events that posed a danger to public safety sued the police officers for defamation. Id. at 243. The police officers then asserted Massachusetts's state law witness privilege -- which usually is absolute -- as a defense against that suit. Id. at 244.

- 30 -

The Massachusetts Court of Appeals explained that Massachusetts's absolute witness privilege for statements made in the course of a judicial proceeding -- much like New Hampshire's absolute witness immunity -- does extend "prior to the actual commencement of the judicial part of the proceeding[]," so long as the proceeding "is contemplated in good faith and . . . is under serious consideration". Id. at 246 (quoting Sriberg v. Raymond, 345 N.E.2d 882, 884 (Mass. 1976)). And, in applying that Provencher-like standard, Dear also made clear -- quite in accord with the way that Provencher applies that standard -- that this privilege has been extended to "pretrial materials prepared by prosecutors and other lawyers," as well as to "witness statements made to the police," at least when they are made "in the context of a proposed judicial proceeding." Id.

But, Dear then went on to point out that "[a]n absolute privilege has not . . . been extended to police officers' own investigatory reports." Id. And thus Dear shows that the same standard Provencher applied is one that has been quite comfortably understood not to require immunity for law enforcement's investigatory reports. In this connection, Dear cited to cases holding that statements made by police officers in the course of investigations were only conditionally privileged. See Seelig v. Harvard Coop. Soc'y, 246 N.E.2d 642 (Mass. 1969). Dear also relied on Buckley v. Fitzsimmons, 509 U.S. 259 (1993), which held -- in

accord with the way that New Hampshire law treats prosecutorial immunity as a matter of state law -- that, under 42 U.S.C. § 1983, prosecutors enjoy absolute immunity only during the judicial, and not the purely investigative, phase of a criminal case. Dear, 983 N.E.2d at 246 (quoting Buckley, 509 U.S. at 273).

In laying out these principles, Dear did not "rule categorically on the privileged status of police investigatory reports in general." Id. at 246 n.7. But, Dear did note that cases in other jurisdictions "have mostly treated police reports under the rubric of a qualified privilege." Id. (citing Marjorie A. Shields, Annotation, Immunity of Police or Other Law Enforcement Officer from Liability in Defamation Action, 100 A.L.R. 5th 341, 377-82 (2002)). Dear then ruled that the statements made by police officers in the investigatory report at issue in that case were entitled to only a qualified, and not an absolute, privilege under Massachusetts law. Id. at 246-47. Dear reasoned that the statements "were made during the investigation, not the prosecution, of the license suspension proceedings. They were made by police officers, not lawyers or prosecutors. For the most part, the report does not contain witness statements but the officers' own speculation or recounting of unidentified hearsay." Id. at 246.

The facts of Dear are by no means identical to those presented here. Dear held that "an absolute privilege does not

extend to statements made by police officers so far removed from any quasi judicial proceedings that would test the truth or falsity of such assertions." Id. And, unlike in our case, the party allegedly defamed by the investigative report in that case was not the party against whom the license suspension proceeding was contemplated. See id. at 246-47. In consequence, the subject of the investigative report there would not have had a chance -- in the way that the plaintiff in the present case would -- to "test the validity" of the offending statements at the contemplated licensing board proceeding. Id. at 247. Moreover, the investigators in Dear were police officers, and thus governmental employees. Here, of course, that is not the case. The investigator who seeks absolute immunity is a private citizen whom the State has retained for this particular investigation.

But, these distinctions aside, Dear did note that, at the time that the police officers prepared the report in that case, they were acting as investigators working for the state's licensing board. Id. In fact, the police officers apparently undertook the investigation as agents of the state's licensing board with an eye towards a possible suspension of the nightclub's license. Id. at 242. And, Dear noted, too, that one of the police officers testified that the information that he gathered for the report uncovered information that could have been used to bring criminal

charges against the disc jockey, even though the officer chose not to do so.  Id. at 247.

Thus, in my view, Dear at least suggests this much: investigative reports prepared for the government in advance of either a future licensing proceeding or a future criminal case are not necessarily entitled to an absolute privilege.  Indeed, Dear represents that there is apparently little support for a contrary conclusion in the precedents of any state.  In consequence, I see no reason to be certain that New Hampshire would approach the question whether absolute witness immunity extends to the investigative acts of those whom the state calls upon to help it enforce the law any differently from the way that the Massachusetts Court of Appeals did in Dear and that, apparently, most states do. And, if that is so, then Provencher can hardly be said to be controlling here.

## III.

To be sure, the defendant in this case is not a state employee.  He is a private citizen whom the State retained to assist in its investigation of a licensee's alleged misconduct. And states often reach out to such private actors for similar investigative assistance in policing the professions.  That feature of this case may distinguish it from others involving state law enforcement investigators -- such as, perhaps, cases that look more like Dear.

Nevertheless, I think it important to recall that the plaintiff in this case contends not only that he was defamed by the allegations lodged against him by the investigator whom the State retained to investigate the possible wrongdoing but also that this state-retained investigator was a direct competitor of his. He thus alleges that the investigator who seeks an absolute immunity for his investigative acts is hardly a person well positioned to perform them on behalf of the State in a disinterested manner. Those allegations -- whether supported by the record or not -- are a reminder of the dangers that can attend the conferral of absolute immunity on those whom the state chooses to arm with significant power to ferret out private wrongdoing, even when those investigators are not full-time employees of the state.[13]

Thus, due to the well-known tendency of absolute power to corrupt absolutely, I see no reason to risk being wrong by expansively construing the scope of New Hampshire's witness immunity to extend beyond the facts of Provencher to encompass this case, too. Instead, I believe it appropriate for us to take

_____

[13] Further, no party makes the argument that qualified immunity would not apply to a contractor like Currier, and the statute codifying official immunity in New Hampshire applies not only to employees but also to "officials" and "officers." So, just as the parties appear to accept that the proceeding here is "judicial," they also appear to accept that if witness immunity does not apply, at least official immunity -- as opposed to no immunity at all -- does.

- 35 -

the more cautious approach of certifying the question to the New Hampshire Supreme Court so that it may weigh for itself the competing interests that are at stake in a case of this special sort and then fashion a rule in response.  For these reasons, I respectfully dissent.